**BEFORE THE UNITED STATES
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE: APPLE INC. SMARTPHONE ANTITRUST LITIGATION** | **MDL No. 3113** |

**BRIEF IN SUPPORT OF MOTION TO TRANSFER RELATED DEVELOPER ACTIONS TO THE DISTRICT OF NEW JERSEY FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

I.    INTRODUCTION ........................................................................................................... 4
II.   LEGAL STANDARD .................................................................................................... 5
III.  IMPORTANCE OF DEVELOPER REPRESENTATION IN THE MDL .................. 5
IV.   OVERVIEW OF THE RELATED DEVELOPER ACTIONS ..................................... 9
V.    COMMON QUESTIONS OF FACT ............................................................................ 9
VI.   COMMON LEGAL THEORIES AND RELIEF SOUGHT ....................................... 11
VII.  CLASS DEFINITIONS AND PROCEDURAL POSTURE ...................................... 11
VIII. SIMILARITY OF COMPLAINTS AND DISCOVERY ........................................... 11
IX.   ARGUMENT FOR TRANSFER ................................................................................ 12
A.    RISK OF INCONSISTENT RULINGS ..................................................................... 12
B.    JUDICIAL ECONOMY ............................................................................................. 13
X.    CONCLUSION ........................................................................................................... 15

**Cases**

*Gelboim v. Bank of America Corp.*, 574 U.S. 405, 410 (2015)..................................................................5

*In re Johnson & Johnson Talcum Powder Prods. Mktg.*, Sales Practices & Prods. Liab. Litig., 220 F. Supp. 3d 1356, 1358 (J.P.M.L. 2016)........................................................................................................14

*In re Nat'l Student Mktg. Litig.*, 368 F. Supp. 1311,1316 (J.P.M.L. 1972)..............................................5

*In re Plavix Mktg.*, Sales Practices & Prods. Liab. Litig. (No. II), 923 F. Supp. 2d 1376, 1378-79 (J.P.M.L. 2013) ...............................................................................................................................................14

*Samsung Elecs. Co. v. Rambus, Inc.*, 386 F. Supp. 2d 708, 721 (E.D. Va. 2005)....................................13

*United States of America, State of New Jersey, et al v. Apple Inc.*, 2:24-cv-04055 (D.N.J.)..................4

**Statutes**

28 U.S.C. § 1407 .......................................................................................................................................5

**Rules**

JPML Rule 6.2(d) ..................................................................................................................................4, 14

## I.    Introduction

1. The United States Department of Justice and sixteen state attorneys general filed an antitrust complaint on March 21, 2024 in the District of New Jersey, i.e. *United States of America, State of New Jersey, et al v. Apple Inc.*, 2:24-cv-04055 (D.N.J.), which is currently pending before United States Judge Julien X. Neals. On June 7, 2024, the Judicial Panel on Multidistrict Litigation (JPML) designated the District of New Jersey as the transferee district for MDL No. 3113. This MDL comprises related class action lawsuits derived from the DOJ's complaint, asserting common questions of fact.

2. The JPML's decision to centralize these cases in New Jersey emphasized the convenience and efficiency benefits of such consolidation. The Panel noted:

    > *"[MDL Cases] involve common questions of fact and that centralization in the District of New Jersey will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. The actions share common questions of fact arising from allegations that Apple has monopolized or attempted to monopolize the smartphone market by **controlling the creation and distribution of apps** compatible with the iPhone and suppressing technologies that would make the iPhone more compatible with competitors' devices…*
    >
    > *[MDL Plaintiffs] seek certification of overlapping nationwide and statewide classes of iPhone purchasers and, in some instances, Apple Watch purchasers. [MDL Plaintiffs] variously assert virtually identical claims under the Sherman Act, state antitrust and consumer protection laws. In view of the number of involved actions, districts, and plaintiffs' counsel, centralization will serve the convenience of the parties and witnesses, and conserve judicial resources."*

3. Under JPML Rule 6.2(d), Apple Inc has the following obligation:

    > *"Any party or counsel in a new group of actions under consideration for transfer under Section 1407 shall promptly notify the Clerk of the Panel of any potential tag-along actions in which that party is also named or in which that counsel appears"*

4. Despite the JPML's clear mandate for comprehensive consolidation, Apple failed to notify[1] the Panel of two related iPhone Developer Class Actions. The omission of developers from the MDL necessitates this motion. Coronavirus Reporter Corporation, Greenflight Venture Corporation,

---

[1] Apple successfully argued MDL #3113 extends to Apple Watch cases. Apple's maneuvering for inclusion of Apple Watch, and exclusion of iPhone Developers, may have strategic implications for the overall antitrust litigation. Apple faces considerable competition in the smart-watch sector, but there is near zero competition in the United States for developers who wish to publish smartphone apps. They have little choice but to deal with Apple.

and Calid Inc have filed a class action based on similar or identical conduct alleged in the DOJ Complaint and other MDL #3113 actions. Similarly, *PhantomAlert* (DC District) has filed a developer class action which Apple has termed "a facsimile of Coronavirus Reporter." These two lawsuits are collectively referred to as "Related Developer Actions" and are enumerated on the attached Schedule of Actions.

5. Pursuant to 28 U.S.C. § 1407 and JPML Rules 6.2 & 6.3, Plaintiffs Coronavirus Reporter Corporation ("CRC"), Greenflight Venture Corporation, and Calid Inc. ("Plaintiffs") respectfully move for an order transferring the Related Developer Actions to the New Jersey District, for coordinated and consolidated pretrial proceedings with the existing MDL cases.

## II.     Legal Standard

6. The "basic purpose" of multidistrict litigation is to secure the "just, speedy and inexpensive determination of every action." *In re Nat'l Student Mktg. Litig.*, 368 F. Supp. 1311,1316 (J.P.M.L. 1972). Section 1407 permits transfer and centralization of cases that are pending in different districts if (1) the cases "involve one or more common questions of fact"; (2) transfer and centralization "will promote the just and efficient conduct of such actions"; and (3) transfer and centralization will further the "convenience of the parties and witnesses." 28 U.S.C. § 1407(a). The aim of § 1407 is to "eliminate duplication in discovery, avoid conflicting rules and schedules, reduce litigation costs, and save the time and effort of the parties, the attorneys, the witnesses, and the courts." *Gelboim v. Bank of America Corp.*, 574 U.S. 405, 410 (2015)(quoting Manual for Complex Litigation § 20.131 (4th ed. 2004)). Transfer of the Developer Actions for consolidated or coordinated pretrial proceedings will satisfy each of these requirements and will advance § 1407's underlying objectives.

## III.    Importance of Developer Representation in the MDL

7. The DOJ complaint against Apple emphasizes the crucial role that developers play in the competitive dynamics of the smartphone market, highlighting how Apple's practices have

5

systematically disadvantaged developers to maintain its market dominance. The complaint submits that developers are central to innovation and competition, and Apple's restrictive measures have stifled their ability to innovate and compete freely.

8. Apple's control over app distribution and creation is central to its anticompetitive strategy. The DOJ complaint details how Apple's monopoly over the App Store and its imposition of contractual restrictions have allowed it to dictate how developers create and distribute apps, thereby limiting their ability to innovate:

> *"Apple exercises its control over app distribution and app creation to dictate how developers innovate for the iPhone, enforcing rules and contractual restrictions that stop or delay developers from innovating in ways that threaten Apple's power." (DOJ Complaint, p. 44)*

9. This control has far-reaching effects, limiting competition and harming both developers and consumers. For instance, Apple's restrictions on APIs and its arbitrary enforcement of App Store guidelines prevent developers from fully utilizing iPhone capabilities, which in turn stifles innovation and consumer choice.

10. The financial impact on developers is another critical issue. Apple's imposition of high fees on app sales and in-app purchases has created a significant financial burden on developers. This is highlighted by the DOJ:

> *"Apple charges as much as $1,599 for an iPhone and earns high margins on each one, more than double those of others in the industry. When developers imagine a new product or service for iPhone consumers, Apple demands up to 30 percent of the price of an app whose content, product, or service it did not create. Then when a consumer wants to buy some additional service within that app, Apple extracts up to another 30 percent, again for a service Apple does not create or develop." (DOJ Complaint, p. 7)*

11. These fees are seen as a form of "tax" that Apple imposes on developers, which not only reduces their profitability but also discourages new entrants and innovation within the app development ecosystem.

12. Apple's suppression of technologies that could enhance cross-platform compatibility and reduce reliance on iPhones is another area where developers are directly affected. The DOJ highlights several examples where Apple's actions have prevented the adoption of technologies that would benefit both developers and consumers:

    *"For example, super apps, cloud streaming games, messaging apps, smartwatches, and digital wallets are all areas where Apple has used its control over app distribution and APIs to suppress technologies that would enable greater competition and innovation." (DOJ Complaint, p. 10)*

13. These technologies could have allowed developers to create more versatile and competitive apps, but Apple's restrictions ensure that these innovations do not threaten its dominant position.

14. The cumulative effect of Apple's practices has been a long-term harm to innovation. By maintaining stringent controls over how apps are developed and distributed, Apple not only limits current competition but also reduces the incentive for future innovation. The DOJ complaint notes:

    *"Apple's conduct has made its own products worse, sacrificing the short-term profits Apple could earn from improving the iPhone in order to preserve the long-term value of maintaining its monopoly. In a competitive market, Apple would compete aggressively to support the development of popular apps and accessories for iPhone users, which would in turn make iPhones more attractive to users and more valuable." (DOJ Complaint, p. 131)*

15. This ongoing suppression of developer innovation highlights the importance of addressing these issues within the broader context of antitrust litigation against Apple. The DOJ complaint extensively details Apple's anticompetitive behavior towards app distribution and developers. This includes allegations of monopolistic practices that hinder competition and innovation in the app development market. By controlling the creation and distribution of apps, Apple has not only harmed consumers but also stifled developers, a critical component of the ecosystem.

16. The DOJ's focus on developer harm is echoed in Plaintiffs' amended complaint, which incorporates the government's allegations nearly verbatim in implementing a class action developer compensation fund. This demonstrates a direct alignment with the DOJ's findings and illustrates the need for developer representation in the MDL to ensure that these issues are

adequately addressed.

17. Developers are an integral part of the app ecosystem and their exclusion from MDL 3113 would result in a significant gap in representation. The DOJ complaint specifically mentions the harm to app distribution and developers, making it imperative that developers have a voice in the consolidated proceedings.

18. With regards to the underlying litigation, Assistant Attorney General Jonathan Kanter asserted, without ambiguity, that developers are a key stakeholder in the government's litigation:

> *"We look forward to litigating this important case alongside our state partners to deliver the benefits of competition to consumers, **app developers**, accessory makers, and the American public."*

19. Apple's alleged conduct, which includes imposing restrictive conditions and exorbitant fees on developers, directly affects their ability to innovate and compete. This not only harms the developers but also limits consumer choice and stifles technological progress.

20. As detailed below, both CRC and PhantomAlert are in a similar pre-discovery procedural posture as the existing actions in MDL 3113. This commonality ensures that integrating these cases will not disrupt the current proceedings but rather complement and enhance the overall litigation strategy. The shared factual and legal questions between these developer cases and the existing MDL actions highlight the efficiency and necessity of consolidation. This will prevent duplicative discovery efforts, streamline pretrial motions, and ensure consistent rulings across related cases.  Including developer actions will prevent the risk of inconsistent judgments and promote judicial economy. Centralizing these actions ensures that one judge can oversee and manage the overlapping discovery and pretrial issues, which is vital for maintaining consistency in rulings and avoiding conflicting decisions. Understanding how Apple's conduct impacts both consumers, and developers, will facilitate a more holistic understanding of the DOJ case. Including developers helps consumers, and vice versa.

21.   The outcome of MDL 3113 will have significant implications for the app development industry.

8

Ensuring that developers are adequately represented in the MDL will help address systemic issues within the industry and promote a more competitive and innovative environment.

22. The inclusion of developer claims aligns with the broader goals of antitrust litigation, which seeks to protect not only consumers but also the competitive process and the entities that drive innovation.

### IV. Overview of the Related Developer Actions

23. CRC and co-Plaintiffs filed the most recent operative complaint on July 27, 2024. Similar to the majority of MDL #3113 participants, the CRC First Amended Complaint is directly derived from the DOJ Complaint, with near verbatim sections on Smartphone Industry, Relevant Sherman markets, and Claims for Relief. CRC alleges the following putative classes:

> -All U.S. Smartphone developers of any free app (zero-priced) that suffered economic losses through disallowance, censorship, and/or ranking suppression on the App Store.
> -Any US [Performance] Smartphone developer who paid a $99 annual subscription fee to Apple for access to its userbase and/or app "notarization."

PhantomAlert filed its most recent First Amended Complaint on July 10, 2024, and alleges the following putative class:

> -All developers of Covid-19-related apps who were denied possible access to the App Store as the result of disparate, inconsistent, pretextual application of the Issuance Guideline, and/or denied possible access to the App Store for their Covid-19-related apps as the result of Apple's failing to notify them of the institution and application of the Endorsement Guideline, under which their apps might have qualified for the App Store.

24. CRC's classes cover nearly all US developers; PhantomAlert's proposed classes pertain to a subset of developers, namely, those who wrote COVID-19 tracking apps. Nonetheless, Apple calls the case "identical" to CRC, and both cases concern the documented anticompetitive conduct towards developers that is described throughout in DOJ complaint.

### V. Common Questions of Fact

25. The CRC complaint plainly derives from the Government Action filed in the District of New Jersey and alleges that Apple knowingly deters competition by designing iPhones to block cross-platform technologies between iPhones and Android smartphones in order to increase Apple's smartphone monopoly.

26. Apple claims that it has prohibited the design and installation of cross-platform technologies on its smartphone platform for "security" and "privacy."

27. Plaintiffs, consistent with the Government Action, allege that Apple's course of conduct deters competition in the smartphone markets in order to charge supracompetitive prices for its iPhone and downstream app markets. The relevant markets in Plaintiffs' complaint include the Smartphone & Performance Smartphone markets, as alleged by DOJ. Similarly, Plaintiffs allege Apple unlawfully maintains its monopoly power and harms competition by imposing contractual restrictions, fees and taxes on app creation and distribution, and that Apple uses critical access points in the smartphone ecosystem to control the behavior and innovation of third parties in order to insulate itself from competition.

28. Accordingly, resolution of the litigations clearly will involve common questions of fact.

29. CRC represents the first-to-file Sherman Act class action filed on behalf of developers of free iPhone apps, which constitute the majority of apps distributed on the App Store. The developers' claims directly reinforce and corroborate DOJ's antitrust charges, namely that Apple has monopolized or attempted to monopolize the smartphone market by controlling the creation and distribution of apps compatible with the iPhone, thereby suppressing competition and innovation. In this light, the Related Developer Actions are already noted as relevant by the Panel in its Transfer Order:

> "The actions share common questions of fact arising from allegations that Apple has monopolized or attempted to monopolize the smartphone market by controlling the creation and distribution of apps compatible with the iPhone and suppressing technologies that would make the iPhone more compatible with competitors' devices." (MDL No. 3113, Transfer Order, June

*7, 2024, Document 33, at 1).*

## VI. Common Legal Theories and Relief Sought

30. The claim theories in CRC *et al.* are virtually identical to those in the existing MDL 3113 cases, including violations of the Sherman Act and state antitrust and consumer protection laws. Plaintiffs in these actions seek similar relief, including damages, declaratory relief, injunctive relief, attorney fees, and other appropriate remedies. CRC's FAC contains the elements highlighted by the JPML:

   > *"Plaintiffs allege that Apple's practices and conduct relating to five technologies—'super apps,' cloud streaming gaming apps, messaging, smartwatches, and digital wallets—have impeded users from purchasing non-Apple products." (MDL No. 3113, Transfer Order, June 7, 2024, Document 33, at 1).*

## VII. Class Definitions and Procedural Posture

31. The proposed classes in CRC and PhantomAlert consist of developers who have suffered economic harm due to Apple's monopolistic practices. These definitions relate substantially to those in the MDL, which includes consumers affected by Apple's conduct regarding iPhone, and even Apple Watch. Here, Apple's conduct towards iPhone developers directly impacts iPhone consumers. As noted earlier, both CRC and PhantomAlert are in preliminary procedural postures, similar to the actions currently consolidated in the MDL. Both have faced seemingly improper motions at this early stage; by joining the MDL, Apple may be less inclined to engage in motion practice.

## VIII. Similarity of Complaints and Discovery

32. CRC's amended complaint contains nearly all the allegations found in the DOJ complaint, verbatim, with additional sections describing several downstream app markets, which help to support the need for a class action developer compensation fund. The key relevant market definitions of performance smartphones are identical to DOJ's, as are the first four causes of

11

action under the Sherman Act. The complaint follows the exact structure of the DOJ complaint and shares most heading titles. The DOJ complaint alleges that Apple harmed app distribution and developers, which is who Related Developer Actions represent. Therefore, they should be included in the MDL to adequately represent developers.

### IX. Argument for Transfer

33. Centralizing CRC and other Related Developer Actions in MDL 3113 will prevent duplicative discovery and motion practice, thereby conserving judicial resources and promoting consistent rulings, particularly concerning class certification and *Daubert* issues. As the JPML indicates:

> *"Centralization is particularly merited here, as these overlapping cases are highly complex and likely will involve time-consuming fact and expert discovery. Further, centralization will avoid the possibility of inconsistent pretrial rulings, particularly with respect to class certification and Daubert issues." (MDL No. 3113, Transfer Order, June 7, 2024, Document 33, at 2).*

34. Centralizing these actions in the District of New Jersey is convenient for parties and witnesses. Both CRC and Phantom Alert's management, and their attorneys, are located on the East coast. The Northern District of California has substantial involvement, but the District of New Jersey is equally accessible and already handling a significant portion of the related actions. The JPML emphasized the importance of a convenient forum:

> *"The District of New Jersey is an appropriate transferee district for this litigation. Twenty-six of the 41 total actions are pending there before Judge Julian X. Neals, and Apple and most of the responding plaintiffs request centralization in that district." (MDL No. 3113, Transfer Order, June 7, 2024, Document 33, at 3).*

#### a. Risk of inconsistent rulings

35. Because the Government Action involves issues of fact and law that largely overlap with the Related Developer Actions, and because these actions do not yet have a developed procedural history, transfer should prevent or reduce inconsistent pre-trial rulings. This is especially relevant with respect to rulings concerning discovery of Defendant Apple, third parties and experts, which may ultimately lead to judgments in the Government and Related Actions that are, or may be, inconsistent. Moreover, because the Government Action cannot be transferred from the

District of New Jersey due to 28 U.S.C. § 1407(g), and because the Related Developer Actions will quite possibly be consolidated, the need for coordination and consistency in the same District, particularly in pre-trial discovery and the development of a consistent body of evidence, is paramount to avoid inconsistent judgments.

### b. Judicial Economy

36. "Judicial economy and the avoidance of inconsistent judgments are prominent among the principal elements of systemic integrity." *Samsung Elecs. Co. v. Rambus, Inc.*, 386 F. Supp. 2d 708, 721 (E.D. Va. 2005). Here, the transfer of the Related Actions to the District of New Jersey is necessary to avoid the risk of inconsistent judgments and to facilitate systemic judicial economy.

37. Judicial economy favors transfer to the District of New Jersey because the court overseeing the Government Action proceeding in the District of New Jersey per 28 U.S.C. § 1407(g), will need to invest substantial time and energy to become familiar with the factual and legal issues underpinning the complex technical product and market characteristics that support the antitrust allegations. Transferring the Related Actions to a different District, or keeping them in Wyoming and DC, would create a significant waste of judicial resources by requiring three separate judges to develop complex technical product and marketing familiarity in order to decide similar discovery disputes or procedural issues. See, *In re Johnson & Johnson Talcum Powder Prods. Mktg.*, Sales Practices & Prods. Liab. Litig., 220 F. Supp. 3d 1356, 1358 (J.P.M.L. 2016); citing, *In re Plavix Mktg.*, Sales Practices & Prods. Liab. Litig. (No. II), 923 F. Supp. 2d 1376, 1378-79 (J.P.M.L. 2013) (observing that centralization "likely will facilitate coordination among all courts with Plavix cases, simply because there will now be only one federal judge handling most or all federal Plavix litigation.")

38. Transfer will minimize the risk of inconsistent judgments and facilitate systemic judicial economy by allowing one judge to manage the overlapping discovery and pretrial issues. The

JPML Transfer Order supports this point:

> *"Centralization will also serve the overall convenience of the parties and witnesses, and promote the just and efficient conduct of the Related Actions, by eliminating duplicative discovery and depositions; reducing discovery-related travel, costs, and schedule conflicts; eliminating duplicative discovery disputes and motion practice; and avoiding conflicting rulings on discovery disputes." (MDL No. 3113, Transfer Order, June 7, 2024, Document 33, at 2).*

39. Under JPML Rule 6.2(d), Apple was aware of CRC and other developer cases but failed to comply with the rule. Including CRC and PhantomAlert in the MDL ensures adherence to procedural fairness and prevents any party from being improperly excluded from the coordinated proceedings. As highlighted in our letter to the Clerk:

> *"On April 25, a 28 U.S.C § 1407 pleading was filed in the MDL (Docket Entry #34) by Plaintiff Louis Levine ("LevineMotion"). The Levine Motion included Coronavirus Reporter Corporation ("CRC") in the service list of related actions, and the document was subsequently filed in the docket for CRC by the Wyoming Clerk. Notably, CRC did not oppose this filing, which constituted assent under MDL Rules. Apple did not oppose CRC's inclusion in the Levine Motion service schedule. However, subsequent compliance with MDL Rule 6.2 by Apple has been lacking."* (*Letter to Clerk*, MDL No. 3113, Document 124-3, June 25, 2024).

40. Upon learning of the MDL 3113 from the *Levine Motion*, CRC assented to either California or New Jersey for pre-trial proceedings, believing joining the MDL in either district would be in the interest of judicial economy. But due to an apparent error, and despite being placed on MDL Plaintiff Levine's service list, CRC was not assigned to the MDL, which defeats the purpose of judicial economy and the reason why the *Levine Motion* was docketed with the Wyoming Clerk.

41. The Assistant Attorney General and various states have recognized the need to restore competition in the smartphone markets. Including developer actions like CRC and PhantomAlert aligns with this broader effort to address Apple's anticompetitive practices comprehensively.

42. After due deliberation regarding joinder of Apple Watch case to MDL #3113, the JPML found the argument Apple Watch and iPhone concern different types of anticompetitive conduct to be "not persuasive." *(Order p.2).* The JPML found that although Apple Watch "may present separate issues, the actions will involve substantial factual overlap and common discovery." In

sum, if joinder of Apple Watches to iPhone litigation is in the interest of judicial economy, then it logically follows iPhone developers should also be part of the litigation.

## X.    Conclusion

43. For the foregoing reasons, Plaintiffs respectfully request that the Judicial Panel on Multidistrict Litigation grant their motion to transfer all Related Developer Actions to MDL No. 3113 in the District of New Jersey for coordinated or consolidated pretrial proceedings.

Respectfully submitted,

        **AMERICAN WEALTH PROTECTION**
        /s/ Keith Mathews
        Keith Mathews
        1000 Elm Street, Suite 800
        Manchester, NH 03105
        603-622-8100
        keith@awplegal.com

        *Counsel for Coronavirus Reporter Corporation*
        *& CALID Inc.*

Dated: July 26, 2024